## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
)
                Plaintiff, )
)
              v. )     1:05CV00744
)
GREAT STEAKS, INC., )
)
              Defendant. )

### RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

This case comes before the Court on Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed the instant action, alleging that Great Steaks, Inc. ("Great Steaks") and Clipper Seafood Restaurant, Inc. ("Clipper Seafood"), through their owner John Pantazis ("Pantazis"), sexually harassed a number of his female employees in violation of Title VII, 42 U.S.C. § 2000e. Specifically, the complaint alleges that Pantazis subjected the employees to a sexually-hostile work environment through unwelcome sexual comments and touching.

As discovery progressed, the number of purported class members involved in Plaintiff's lawsuit, initially estimated at seven or more, diminished significantly. Plaintiff dropped Dorathy Carter ("Carter"), the original charging party, from the suit in August 2006, and as of December 2007, Stephanie Jones ("Jones") was, and is, the sole remaining complainant. The parties also filed a joint stipulation on December 21, 2006 in which Plaintiff agreed to

dismiss Clipper Seafood from the lawsuit and Defendant agreed to withdraw its pending motion to dismiss. Thus, the summary judgment motion now before the Court is solely concerned with the sufficiency of Jones' hostile work environment allegations against Great Steaks.

The facts supporting these allegations, in the light most favorable to Plaintiff, are as follows. In December 2004, Defendant began hiring employees for its new restaurant, Austin's Bar & Grill ("Austin's"), which opened the following month. Defendant selected Jones and Carter, among others, as hostesses, and the two women often worked the lunchtime shift together.

Jones contends that Pantazis' first inappropriate conduct toward her took place at the conclusion of her job interview, when Pantazis "looked [her] up and down and [said] 'You look good. You've got the job.'" (Jones Dep. p. 70.) Pantazis continued to tell Jones that she "looked good" every day of her part-time employment at Austin's, which lasted for approximately two months. (Id. p. 265.) Jones also claims that she and Carter often noticed Pantazis staring at them, or at least in the direction of the hostess stand, while they worked. (Id. p. 135.) On one occasion, Jones observed Pantazis place his hand on the small of Carter's back, right above where the crevice between her buttocks starts, as he stood next to her at the hostess stand. (Id. pp. 119-122.) Carter allegedly told Pantazis to stop, and she later told Jones that the incident made her feel uncomfortable. (Id. pp. 123-124.) At other times, Jones saw Pantazis grab Carter's arm and place his

-2-

hand on her shoulder, again while standing at the hostess stand. (Id. pp. 124-125.) Carter eventually left her job at Austin's in early February 2005, and on February 14, 2005, she filed a discrimination charge against Defendant.

In addition to observing Pantazis' behavior toward Carter, Jones alleges that the restaurant owner touched her on three occasions, looked down her shirt and remarked on her breasts on two or three occasions, and made several other sexually-charged comments, including explicitly asking her for sex. The first two touchings mirrored those involving Carter, with Pantazis' fingertips touching the top of Jones' buttocks for 30–45 seconds as he stood beside her at the hostess stand looking at a seating diagram. She asked him to remove his hand and the hand came off as she walked away. She told her mother about the incident when she got home and told a co-employee the next day. (Jones Dep. pp. 170-180.) About two days later, Pantazis repeated the touching on Jones' lower back and then sliding his hand down to on or right above her buttocks. (Id. pp. 178-180.) When Jones looked at him and told him to stop, Pantazis walked away. (Id. p. 181.) Dorathy Carter was present during this encounter. (Id.) A third, similar incident occurred when Pantazis' hand touched Jones' thigh as he stood next to her. (Id. pp. 184-185.) This occurred a month and one-half after she started working. (Id.)

More blatant conduct occurred based on Jones' allegations that Pantazis looked down her shirt from the other side of the hostess stand "[t]wo or three times" and told her that "they looked nice,"

-3-

that is, her "breasts looked nice."[1]  (See id. pp. 159, 225-231.)
In addition, during her two-month employment, Pantazis allegedly
(1) offered her a key to his apartment, (id. p. 149), (2) asked her
to "go off with him," which she interpreted as a sexual proposition
and she so informed her mother, (id. p. 250-253), and (3) asked her
if she would "like to have sex," (id. p. 247).  The requests came
as a total non-sequitur in the context of the surrounding
conversation, and she turned each one of them down.  Additionally,
although Jones never witnessed Pantazis making sexual comments or
propositions to other employees, Carter informed her that he had
done so.  (See, e.g., id. p. 166.)

     While Jones told both her mother and Carter how uncomfortable
Pantazis' actions and comments made her, she never reported any
problems to her supervisor or other members of Defendant's
management, either during her employment or after she quit.[2]  A
conflict with her manager, Jamey Jarrett ("Jarrett"), was the
primary factor in her decision to leave Austin's, with harassment
being a secondary concern.[3] (Id. pp. 49, 263.)  She also claims,

---

[1]There is no indication that Plaintiff chose her clothes to expose her
breasts.  Indeed, at all times relevant to this lawsuit, in line with Austin's
dress policy, Jones wore a white button-down shirt and black slacks.  (Jones Dep.
pp. 227-228.)  In addition, Jones states that, although the top button of the
shirts she wore was relatively low, she always wore a tank top underneath them.
(Id.)

[2]Jones' manager contends that she did not quit.  Instead, he claims that
he fired Jones for talking on her cell phone.  (See Jarrett Dep. p. 105.)

[3]Jones states that Jarrett yelled and cursed at her for being on her cell
phone while clocked in.  (Jones Dep. pp. 46-49, 263.)  Because the caller, Jones'
(continued...)

-4-

however, that she was unaware that Defendant had a sexual harassment policy during her brief tenure at Austin's. (Jones Aff. ¶ 2.) In particular, she alleges that she never received a copy of the policy or training regarding it, nor was the policy posted anywhere in the restaurant. (Id. ¶¶ 3-9.) Defendant now argues that, even if all of the above allegations are true, the conduct of which Jones complains is simply not sufficiently severe, threatening, or humiliating enough to support a hostile or abusive work environment claim. Defendant also contends that none of Pantazis' alleged conduct is imputable to Great Steaks, as required for liability under Title VII.

## Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990). When opposing a properly supported motion for summary judgment, a party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. Id. "The summary judgment inquiry thus

---

[3](...continued)
mother, was contacting her with news that Jones' grandmother was critically ill when the conflict with Jarrett occurred, Jones became extremely upset and claims to have quit on the spot. (Id.) In doing so, she made no mention of Pantazis' behavior as a motivating factor for her decision.

-5-

scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence*, that could carry the burden of proof of his claim at trial." <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).  A mere scintilla of evidence will not suffice. Rather, there must be enough evidence for a jury to render a verdict in favor of the party making a claim.  <u>Sibley v. Lutheran Hosp. of Maryland, Inc.</u>, 871 F.2d 479, 486 (4th Cir. 1989).

## Discussion

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  While this prohibition clearly "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998), it must also be noted that "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace," <u>Hopkins v. Baltimore Gas and Elec. Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996).  Thus, occasional gender-related jokes, sexual innuendos and teasing, or abusive language are insufficient to establish a claim of sexual harassment due to a hostile or abusive work environment.  <u>See</u>, <u>e.g.</u>, <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).  Instead, a plaintiff must show that his or her workplace is "permeated with discriminatory intimidation, ridicule, and insult that is

-6-

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The Fourth Circuit employs a four-part test to analyze the sufficiency of such claims. A plaintiff must show conduct that "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003). Here, Defendant contends that Jones' allegations fail to establish any of the above elements.

Defendant argues that Plaintiff must "show sex-based harassment which was unwelcome to Stephanie Jones and because of her gender." (Def.'s Br. 9.)[4] Defendant attempts to discuss elements one and two in tandem. This argument implies that the conduct must be sex-based in order to qualify as unwelcome under Title VII. In doing so, it confuses conduct of a "sexual nature" with the broader concept of conduct "because of" the victim's sex. See Oncale, 523 U.S. at 79-81. Of course, much of the conduct in the instant case was of a sexual nature. Nevertheless, it is also abundantly clear that all of Pantazis' conduct was directed to Jones because of her gender, including the touching, the comments about her breasts, and the requests for sex, which were also clearly of a sexual nature.

---

[4]Defendant cites a number of cases in support of its motion which have subsequently been reversed or vacated. Thus, there is no need to discuss them.

-7-

Defendant's argument that Jones' allegations were too trivial and/or isolated to support a sexual harassment claim speaks directly to the third prong of Plaintiff's hostile environment claim. This prong asks whether Defendant's conduct was severe and pervasive enough to alter Plaintiff's conditions of employment and to create an abusive work environment.

The Supreme Court, in <u>Harris</u>, provides substantial guidance to lower courts considering whether a plaintiff has satisfied the pivotal third element of a hostile work environment claim. First,

> [t]he conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.

<u>Harris</u>, 510 U.S. at 21-22. In this case, Plaintiff clearly forecasts sufficient evidence that Jones perceived her work environment to be sexually hostile. She has stated as much, and the evidence supporting it cannot be said to border on being frivolous or delusional. <u>See</u> <u>E.E.O.C. v. Sunbelt Rentals, Inc.</u>, \_\_\_\_ F. 3d \_\_\_\_, No. 07-1123, 2008 WL 836409 (4th Cir. March 31, 2009), and <u>E.E.O.C. v. R&R Ventures</u>, 244 F.3d 334, 339 (4th Cir. 2001). The more significant issue for summary judgment purposes is whether the cumulative evidence creates a genuine issue of material fact regarding whether her perception was, in fact, objectively reasonable. <u>Id.</u>

When examining whether a work environment may reasonably be considered hostile or abusive, <u>Harris</u> requires the courts to

-8-

examine the totality of the circumstances.  These include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted."  <u>Conner v. Schrader-Bridgeport Intern., Inc.</u>, 227 F.3d 179, 193 (4th Cir. 2000)(citing <u>Harris</u>, 510 U.S. at 23).  This test cannot be applied mechanically because, by its nature, it concerns individual personal relationships and social expectations; but, it also must encompass the much broader and diverse working environments throughout the nation.  <u>Sunbelt Rentals</u>, 2008 WL 836409.

Notably, "[u]nlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332, 339 (4th Cir. 2006).  The kind and number of instances which must accumulate to create a hostile environment can often be a close question, because the "line between a merely unpleasant working environment and a hostile or deeply repugnant one may be difficult to discern." <u>Hopkins</u>, 77 F.3d at 753(citations omitted).  In all events, the conduct must be sufficiently extreme so as to materially alter the conditions of employment and create an abusive work environment. <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986); <u>Sunbelt Rentals</u>, 2008 WL 836409.  In the present case, a careful review of the cumulative evidence suggests that, while some of the conduct of

-9-

which Jones complains admittedly straddles the line between hostile and merely unpleasant, the proffered evidence is not so insufficient that a jury could not reasonably render a verdict in Plaintiff's favor.

The element of pervasiveness arises from both the frequency of Pantazis' otherwise innocuous, but unpleasant, conduct and the specific incidents of blatant conduct occurring within a two-month period. First, Jones alleges that Pantazis told her that she looked good every day of her approximately two months at Austin's. In addition, Pantazis allegedly stared at her, or at least in the direction of the hostess stand, on a daily basis. Standing alone, these incidents would not normally amount to a hostile work environment. Here, however, there was more. Pantazis allegedly made two to three comments about Jones' breasts, touched her inappropriately on three occasions, and solicited her for sex, directly or implicitly, on three additional occasions. All of this occurred within the condensed time period of two months. These blatant incidents give added meaning to the daily comments and staring, which, in this light, could be viewed as evidence of daily harassment.

The allegations of egregious conduct also bolster the severity element of Plaintiff's claim.[5] According to Jones' testimony, Pantazis expressly and implicitly solicited her for sex on three

---

[5]Notably, conduct must be severe *or* pervasive to survive summary judgment. There is no requirement that it be both. <u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 808 (7th Cir. 2000).

-10-

occasions.  Some courts suggest that this alone may be enough to survive summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Quantock v. Shared Marketing Serv., Inc.</u>, 312 F.3d 899, 904 n.2 (7th Cir. 2002)(reversing summary judgment where plaintiff alleged that supervisor asked her three times for sex).  But, there is more.  In the same two to three month time frame, Jones claims that Pantazis looked down her shirt and commented on her breasts two or three times and touched her in an ambiguously sexual way on three additional occasions. <u>Compare</u> <u>Rorie v. United Parcel Serv., Inc.</u>, 151 F.3d 757, 762 (8th Cir. 1998)(summary judgment denied where supervisor repeatedly patted female employee on her back, brushed up against her, and told her she smelled good).  The objective evidence of the severity and pervasiveness of the alleged misconduct, and the likely lack of its being innocent by-play, in this case is heightened by the significant age and power discrepancies between Pantazis, Defendant's 65-year-old president and owner, who was also Jones' supervisor, and Jones, who was an 18-year-old hostess at the time the above-described events occurred.  <u>See</u> <u>R&R Ventures</u>, 244 F.3d at 340(severity of male supervisor's sexual misconduct was compounded where victim was "barely half his age"); <u>Jennings v. University of North Carolina</u>, 482 F.3d 686, 696 (4th Cir. 2007)(older, extremely powerful soccer coach versus his young players).

Further, the nature of Pantazis' alleged conduct, particularly the solicitation of sexual relations and the comments on her breasts, at the very least, straddles the line between mere "offensive utterances" and "physically threatening or humiliating"

-11-

behavior.  See Conner, 227 F.3d at 198 (supervisor's inappropriate personal questions, "in context and by their frequency," amounted to humiliating conduct); R&R Ventures, 244 F.3d at 340("incessant put-downs, innuendos, and leers" directed at young female employees created a hostile work environment where they caused the women "to become sick at the prospect of going to work").  While the more blatant inappropriate incidents did not occur on a daily basis, they cannot be said to be infrequent or isolated given the short two-month employment period.  As a result of these more blatant incidents, the daily staring and comments take on a different, more threatening tone.

Some "rolling with the punches" can be expected as a "fact of workplace life."  Sunbelt Rentals, 2008 WL 836409, at *6.  And, this is especially true when the alleged harassment comes from co-workers.  However, the matter takes on a different aspect when the harassment comes from the supervisor, as in the instant case.  Id. at *9.  The fact that the alleged harassment came from the older, much more powerful Pantazis, who was Defendant's president and owner, and Jones' supervisor, separates this case from those where the unpleasantries come from co-workers.  Pantazis apparently even handed out employee checks at times, clearly emphasizing the power disparity between him and Jones, and the potential threat to Jones.

There is also some evidence that Pantazis' actions interfered with Jones' work, as she claims that his conduct played at least some role in her ultimate decision to quit her job.  While this part of Jones' case may not be the strongest, there is other

-12-

evidence that her working conditions were discriminatorily altered. R&R Ventures, 244 F.3d at 340(fact that the plaintiff sought re-employment did not obviate claim). Here, Jones had to move away from Pantazis' touching. The conduct made her uncomfortable and caused her to complain to co-workers. She increased her vigilance. The fact that Jones had to be wary of her supervisor is a factor in finding the alleged harassment materially altered her conditions of employment. See, e.g., Sunbelt Rentals, 2008 WL 836409.

Admittedly, Jones' foggy memory concerning the exact dates and details of Pantazis' actions is somewhat detrimental to her forecast of evidence, as it implies that these events did not create a severe and lasting impression. Plaintiff's failure to place these claims in context by including dates or, at times, even temporal relationships between the alleged actions, is particularly troubling. Nevertheless, the testimony cannot be said to be wholly incredible. And, it must be remembered that this was Jones' first full time job and, therefore, the surprise and shock of Pantazis' alleged conduct may well explain the vagueness of the memory. Finally, her deposition occurred over two years after the incident, and this could explain the inability to immediately supply details in the deposition. In any event, the credibility and weight of the evidence are for a jury to decide, not the Court in a motion for summary judgment.

As for the fourth and final element of Plaintiff's claim, liability, if it exists, may be imputed to Defendant due to Pantazis' position as Defendant's proxy or alter ego. See Faragher

-13-

v. City of Boca Raton, 524 U.S. 775, 789-790 (1998).  In Faragher, the Supreme Court first noted that there is a "class of an employer organization's officials who may be treated as the organization's proxy" for purposes of hostile work environment claims.  524 U.S. at 789.  In doing so, it specifically cited Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992), which held an employer-corporation liable where harassment was perpetrated by its owner.  This rule clearly encompasses Pantazis, who, when the events underlying this lawsuit arose, was acting as Defendant's owner and president.[6]  Thus, Plaintiff meets the final element of its hostile work environment claim.

Defendant raises an affirmative defense in this case based on its claim that it exercised due care to prevent and correct any sexually harassing behavior, and that Jones failed to take advantage of the opportunity provided by the employer to avoid harm.  This affirmative defense has been known as the Ellerth/Faragher defense.  As explained by the Supreme Court in Pennsylvania State Police v. Suders, 542 U.S. 129, 137-138 (2004):

> Both decisions hold that an employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Ellerth, 524 U.S., at 765, 118 S.Ct. 2257; accord Faragher, 524 U.S., at 808, 118 S.Ct. 2275. But when no tangible employment action is taken, both decisions also hold, the employer may raise an affirmative defense to liability, subject to proof by a

---

[6]While it is likely that Pantazis' alleged conduct may also be imputed to Defendant solely by his role as Plaintiff's supervisor, see Brown v. Perry, 184 F.3d 388, 394-398 (4th Cir. 1999), the Court need not solely rely on this basis for employer liability.  The fact that Pantazis was also the owner and operator provides overwhelming support for attributing his actions to the corporation.

-14-

preponderance of the evidence: "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S., at 765, 118 S.Ct. 2257; accord Faragher, 524 U.S., at 807, 118 S.Ct. 2275.

The Suder Court further noted that "both decisions place the burden squarely on the defendant to prove that the plaintiff unreasonably failed to avoid or reduce harm." Id. at 146. The distribution of an anti-harassment policy constitutes compelling proof that the defendant exercised reasonable care in preventing and promptly correcting sexual harassment. Barrett v. Applied Radiant Energy Corp., 240 F.3d 262 (4th Cir. 2001).

In the instant case, Defendant has done little to show that it has satisfied the first prong of the affirmative defense, which is that it had an adequate complaint procedure. In fact, the entire question of whether there existed a complaint procedure is in doubt. In its brief relating to the affirmative defense, Defendant merely referred to Pantazis' affidavit which stated that Great Steaks had a training notebook containing a sexual harassment policy. Plaintiff E.E.O.C., in its response, refers to co-owner Bessie Pantazis' deposition that Defendant did not have a written sexual harassment policy for the time period relevant to this case. (See B. Pantazis Dep. pp. 235-236.) (This alone creates a factual dispute.) Without permission from the Court, Defendant attempted to introduce new evidence in its reply brief by attaching to it, a "Reply Affidavit of John Pantazis." This procedure violates this

-15-

Court's Local Rules, which limit reply briefs to discussion of matters newly raised in the response. (LR7.3(h).) Moreover, it appears that the document first appeared in the Reply Brief Affidavit and was not produced during discovery. No adequate explanation has been advanced for the failure to produce such an important document at an earlier time, for Defendant's own affirmative defense. Therefore, even the document's legitimacy for purposes of this action must be questioned. Defendant's attempt to blame Plaintiff for its own violation of the rules in regard to a document supporting Defendant's own affirmative defense is rejected out-of-hand. As a result, Plaintiff's motion to strike the affidavit should be granted.

In any event, the so-called sexual harassment policy lacks adequate procedures for reporting harassment.[7] <u>See</u> <u>and</u> <u>compare</u> <u>Ocheltree</u>, 335 F.3d at 334. The policy fails to provide for any processing of complaints and a procedure for it to be forwarded up the chain of authority. <u>Id.</u> at 335. Of even greater import, the

---

[7]The pertinent part of the policy reads:

> SEXUAL HARASSMENT IS DEFINED AS OFFENSIVE SEXUAL ADVANCES, REQUESTS FOR SEXUAL FAVORS, OR ANY OTHER CONDUCT OF A SEXUAL NATURE THAT IS UNWELCOMED AND MAKES A PERSON FEEL UNCOMFORTABLE.
>
> IF YOU FEEL YOU HAVE BEEN SUBJECTED TO HARASSMENT, YOU ARE ENCOURAGED TO REPORT THE INCIDENT TO YOUR MANAGER OR THE GENERAL MANAGER. THE COMPANY WILL ATTEMPT TO KEEP SUCH REPORTS CONFIDENTIAL.

This half-hearted policy does little to actually support and advise an employee in reporting incidents. Interestingly, by Defendant's own standards, Pantazis' alleged conduct, if it occurred, clearly amounts to sexual harassment.

-16-

policy and Pantazis' affidavit fail to take into account that Pantazis was the alleged harasser, and fails to explain how the so-called sexual harassment policy would work in a situation like that. Nothing in this so-called policy deals with the serious situation allegedly confronting Plaintiff. Moreover, as Plaintiff points out, the so-called harassment policy has appeared for the first time after the end of discovery, attached to a reply brief, for which Plaintiff has had no time to make an inquiry concerning the existence and actual use of the policy. Therefore, all inferences must be drawn against Defendant.

Even if the Court were to find that Plaintiff had established that it had adopted a reasonable sexual harassment policy, it has failed to satisfy the second prong by showing that Jones unreasonably failed to avail herself of the remedial apparatus. This is particularly true because the alleged harasser in this case is the supervisor and owner of the Defendant. Defendant makes no attempt to explain what reasonable procedures in the harassment policy were available to Jones in this situation. Finally, Jones denies having any knowledge of the policy and Defendant fails to show otherwise. In Pantazis' affidavit, he inappropriately attempts to quibble with Jones' testimony that she did not receive a copy of the employee rules as meaning there was a policy and that Jones knew about it, but only that she did not receive a copy of it. This argument fails because, for summary judgment purposes, the facts must be viewed in a light most favorable to Plaintiff, not Defendant. For these reasons, Defendant's request that this

-17-

Court find that it has established an affirmative defense should be denied.

**IT IS THEREFORE RECOMMENDED** that Defendant's motion for summary judgment (docket no. 34) be denied.

**IT IS FURTHER RECOMMENDED** that Plaintiff's motion to strike the Reply Affidavit of John Pantazis (docket no. 47) be granted, along with the discussion of it in the reply brief.

_____
**United States Magistrate Judge**

April 29, 2008

-18-